SUTTON, J., delivered the opinion of the court, in which STRANCH, J., and STEEH, D.J., joined. STRANCH, J. (pp. 387-94), delivered a separate concurring opinion.
OPINION
SUTTON, Circuit Judge.
In February 1998, Karen Howell pled guilty to three counts of first-degree murder and several other offenses. The state court sentenced Howell to three life sentences without parole for the murders and a host of other sentences for the other crimes, a set of punishments the Tennessee courts affirmed on direct appeal and *383 declined to alter in reviewing Howell’s state collateral-review proceeding. Howell filed a habeas petition in federal court, arguing that she had received ineffective assistance of counsel before pleading guilty. The district court denied the petition. We affirm.
I.
On April 6,1997, Howell and five friends left Pikeville, Kentucky, on their way to New Orleans. At the time, Howell was seventeen, one of the others (Jason Bryant) was fourteen, and the other four (Joseph Risner, Natasha Cornett, Crystal Sturgall and Dean Mullins) were at least eighteen. The group brought two guns with them and started the journey in a rickety car, prompting them to talk about upgrading their mode of transportation by stealing a better car.
At a rest stop near Greeneville, Tennessee, an opportunity presented itself. Vidar Lillelid, a Jehovah’s Witness, approached Howell and her friends while they were sitting at a picnic table. Lillelid began sharing his religious views with the group, and it is fair to say that they did not get the message. Risner displayed one of the weapons and told Lillelid, “I hate to do you this way, but we are going to have to take you with us for your van.” Howell v. Hodge, No. 2:06-CV-108, 2010 WL 1252201, at *2 (E.D.Tenn. Mar. 24, 2010). The Tennessee Supreme Court described what happened next:
Risner directed the Lillelid family to their van even though Mr. Lillelid offered the group his keys and wallet in exchange for allowing the family to remain at the rest area.
Mr. Lillelid drove the van, and Risner, who was still armed, sat in the passenger seat. Howell, Bryant, and Cornett also rode in the van with the Lillelids. Mullins and Sturgall followed in Risner’s vehicle. Mrs. Lillelid began singing in an attempt to console the crying children, and Bryant ordered her to stop. Risner subsequently directed Mr. Lillel-id to a secluded road and ordered him to stop the van. Once outside the van, all four members of the Lillelid family were shot multiple times. Bryant claimed that Risner and Mullins were the shooters, but Howell and her remaining co-defendants maintained that Bryant was the shooter. As Risner drove Howell and her co-defendants from the scene, the van struck one or more of the victims.
Howell v. State, 185 S.W.3d 319, 325 (Tenn.2006).
Vidar, his wife Delfina and his six-year-old daughter Tabitha all died at the scene. Two-year-old Peter survived, but he lost an eye. The six defendants fled toward Mexico but were caught in Arizona after failing to cross the border. Howell and her cohorts still had several of the Lillel-ids’ possessions when the authorities caught them.
The State of Tennessee filed charges against all six defendants and provided notice to the four older defendants that the State would seek the death penalty. The entire group, including the two juveniles, pled guilty in adult court in exchange for withdrawal of the death penalty requests and in exchange for certainty about some of the other punishments. The proposed plea deal offered determinative sentences for some of the crimes (25 years for especially aggravated kidnapping, 12 years for aggravated kidnapping and 4 years for theft), and indicated that the trial court would impose the sentences for the felony-murder and attempted first-degree-murder convictions. The trial court sentenced Howell to three life sentences without the possibility of parole for the three murders and 25 years for the attempted murder of *384 Peter Lillelid, ordering each sentence to be served consecutively. As required by the plea deal, she also received 25 years for especially aggravated kidnapping, 12 years for aggravated kidnapping and 4 years for theft, all to run concurrently. The Tennessee Court of Criminal Appeals affirmed Howell’s sentence. State v. Howell, 34 S.W.3d 484, 515 (Tenn.Crim.App.2000).
Howell filed a state law petition for post-conviction relief, alleging she received ineffective assistance of counsel. In her view, her attorney should have insisted that she undertake a psychological evaluation to determine if her mental condition required her to be committed involuntarily to a psychiatric institution. Had the attorney made this showing, she adds, Tennessee law would have prevented her from being transferred to adult court, at least at that point. The last state court to review this claim, the Tennessee Supreme Court, rejected it on the ground that, although the attorney had performed deficiently, Howell could not show prejudice.
Howell filed a habeas petition in district court. The district court rejected all of her claims, including several not mentioned here. It granted a certificate of appealability on the ineffective-assistance claim.
II.
The ground rules for reviewing Howell’s appeal are not new. To establish ineffective assistance of counsel under the Sixth (and Fourteenth) Amendment, a claimant must show deficient performance and prejudice. Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To obtain habeas relief after a state court rejects an ineffective-assistance claim, the claimant must show that the state-court adjudication: (1) “resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law” or (2) “resulted in a decision that was based on an unreasonable determination of the facts.” 28 U.S.C. § 2254(d). “The standards created by Strickland and § 2254(d) are both 'highly deferential,’ and when the two apply in tandem, review is ‘doubly’ so.” Harrington v. Richter, — U.S.-, 131 S.Ct. 770, 788, 178 L.Ed.2d 624 (2011) (citations omitted). In rejecting Howell’s claim, the state courts and federal district court focused on the absence of prejudice. We will do the same.
Under Tennessee law, a juvenile court “shall” transfer a juvenile defendant to adult court for prosecution and trial if the court has “reasonable grounds to believe” that (1) the juvenile committed the alleged delinquent act, (2) the juvenile is not committable to an institution for the developmentally disabled or mentally ill, and (3) the interests of the community require that the juvenile be put under legal restraint or discipline. Tenn.Code Ann. § 37-1-134(a)(4)(A)-(C). The State readily satisfied the first and third requirements for transferring Howell to adult court given the circumstances of this triple murder. At stake is the second requirement. As Howell sees it, an attorney satisfying the Sixth Amendment right to counsel would have shown the need for an involuntary commitment, and as a result she would not have pled guilty to these offenses. As we see it, the state courts did not unreasonably reject this claim.
The state trial court held a post-conviction evidentiary hearing. Howell called two witnesses who testified she satisfied the prerequisites for an involuntary commitment at the time of the transfer hearing. The first witness was Dr. Leonard Miller. Based on his evaluation nearly six months after the transfer, Miller believed *385 Howell could have met the standards for involuntary commitment under state law. The second witness was Dr. Pamela Auble. She evaluated Howell four years after the conviction and testified that (among other things) Howell could have been involuntarily committed.
The State defended this aspect of the conviction on three general grounds. One, the State pointed out that another psychologist, Dr. Larkin, examined Howell for thirty minutes before the transfer, and he concluded that she could not be committed involuntarily. No one challenged the existence of this interview or the existence of the assessment that arose from it. Two, the State discredited Howell’s witnesses. As for Dr. Miller, it contended that his unequivocal testimony at the hearing was in tension with the equivocal report he wrote in 1998 immediately after evaluating Howell. Howell, 185 S.W.3d at 329-30. As for Dr. Auble, it pointed out that she did not interview Howell until four years after the transfer and that, even then, she relied on Dr. Miller’s equivocal 1998 report. Id.; see also Howell App’x at 12. The thrust of Dr. Auble’s report was not to question whether Howell could have been committed involuntarily but to discuss another issue no longer in the case, namely the voluntariness of her plea. Three, the State pointed out that Dr. Miller, when first contacted by Howell’s counsel, warned counsel that it would be “quite difficult to avoid a transfer” from juvenile to adult court. Howell v. State, No. E2003-01469-CCA-R3-PC, 2005 WL 394552, at *5 (Tenn.Crim.App. Feb. 18, 2005); see also Howell, 185 S.W.3d at 327.
In refereeing this dispute, the state court sided with the State, reasoning that Howell would not have been involuntarily committed even if she had introduced this evidence in support of her position. Howell has not met AEDPA’s rigorous demands for overturning that decision.
First, the bar for involuntarily removing someone from society against her will is high — quite understandably and quite legitimately so. An involuntary commitment amounts to “a massive curtailment of liberty.” Humphrey v. Cady, 405 U.S. 504, 509, 92 S.Ct. 1048, 31 L.Ed.2d 394 (1972). Preventing arbitrary and undeserved imposition of this restriction on freedom “has always been at the core of the liberty protected by the Due Process Clause.” Foucha v. Louisiana, 504 U.S. 71, 80, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992). Tennessee guards these interests through a demanding multi-step inquiry. At the time of the offense, a person could be involuntarily committed “if and only if’ (1) the person was “mentally ill”; (2) the person posed “a substantial likelihood of serious harm because of the mental illness”; (3) the person needed “care, training, or treatment because of the mental illness”; and (4) “all available less drastic alternatives to placement in a hospital or treatment resource” were “unsuitable.” Tenn.Code Ann. § 33-6-104(b) (1997). Only if the State introduced “substantial” proof on each score, commensurate with the “weight and gravity” of the individual interest involved, could an involuntary commitment satisfy due process. Addington v. Texas, 441 U.S. 418, 427, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979).
Second, Howell makes no argument with respect to one of these requirements. She offers no evidence that a commitment was the least restrictive alternative. Neither one of her experts mentions the point, much less offers “substantial” proof to support it. What’s more, their reports suggest that less liberty-infringing alternatives existed, as they mention that Howell would benefit from therapy and medi *386 cation, a form of care she was not receiving before the murders.
Third, the state court had the opportunity to assess the credibility of Drs. Miller and Auble firsthand, and it discounted the credibility of each of them when it came to the likelihood that Howell would have been committed. Federal courts may not lightly ignore such credibility findings; they are entitled to “great deference” and “must be sustained unless [they are] clearly erroneous,” particularly in the context of AEDPA-limited habeas review. Felkner v. Jackson, — U.S. -, 131 S.Ct. 1305, 1307, 179 L.Ed.2d 374 (2011) (per curiam) (quoting Batson v. Kentucky, 476 U.S. 79, 98 n. 21, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986); Snyder v. Louisiana, 552 U.S. 472, 477, 128 S.Ct. 1203, 170 L.Ed.2d 175 (2008)) (internal quotation marks omitted); see also Storey v. Vasbinder, 657 F.3d 372, 379 (6th Cir.2011).
Fourth, consistent with the state court’s ruling, Howell’s evidence was mixed or not on point. While Dr. Miller testified to one set of psychological circumstances at the 2003 hearing, his 1998 report mentioned other psychological circumstances. The 1998 report contained several observations that do not square with a finding that the high bar for removing someone from society against her will had been met. Dr. Miller, for example, noted that Howell was “alert, lucid and oriented in all spheres,” “demonstrated balanced affect throughout” the evaluation, “did not demonstrate any signs or overt symptoms of anxiety or depression,” “did not demonstrate any indication of hallucinations or delusions” and was “not suffering from primary mental retardation.” Howell App’x at 139, 142. She “ha[d] the potential,” he added, “to function within the average range of intelligence.” Id. at 142. Surely this testimony suggests at a minimum that less-drastic alternatives to institutionalization would have been explored.
Even if Dr. Miller’s testimony had been consistent, the subjectivity of psychological evaluations makes it difficult to say that there is only one way to look at Howell’s mental health. A psychological evaluation is not an MRI. In the arenas of neurology and psychology, different experts often have competing opinions with respect to a given person’s mental capacity. This is not to say that psychological testimony cannot in many instances be useful or even dispositive. But it does suggest that weighing psychological reports will always require some deference to the factfinder.
If Dr. Miller’s testimony was equivocal, Dr. Auble’s testimony was largely irrelevant. Her evaluation offers little to no support for Howell’s position, given that four years had elapsed between the transfer hearing and her evaluation and given that Dr. Auble focused on a distinct question — whether the plea was knowing and voluntary. The question was not Howell’s psychological state in 2002 but her psychological state in 1998, and it was not whether the plea was knowing and voluntary but whether she should have been involuntarily committed.
All things considered, the state court fairly concluded that there were “reasonable grounds to believe” Howell was not committable in 1997, even after considering the later psychological evaluations of Howell. See Tenn.Code Ann. § 37-1-134(a)(4)(B). The bar for an involuntary commitment is high, as confirmed by the types of cases in which courts have permitted transfers — juveniles “suffering from mild mental retardation, depression with psychotic features, bipolar disorder, post-traumatic stress disorder, or a treatable drug problem.” State v. Jackson, No. M2002-02248-CCA-R3-CD, 2004 WL 1402555, at *9 (Tenn.Crim.App. June 7, *387 2004). And Howell’s evidence was not strong. At best, she put forward two experts whose testimony was full of gaps and in one instance was largely irrelevant. Neither expert suggested Howell would have been committable for more than a few months. Neither expert relied on any history of medication or treatment for psychological issues before the murders. Neither expert offered any explanation why that kind of care after the murders, surely a less-drastic alternative than an involuntary commitment, would not have addressed the psychological problems they identified. And neither expert indicated that Howell is being medicated or treated for psychological issues in prison. As required by due process, Tennessee law begins with a heavy presumption of noneom-mittability, and the state court reasonably concluded that Howell’s appellate counsel had not supplied enough credible evidence to overcome that presumption.
Howell faces a second prejudice problem. When a defendant makes an ineffective-assistance claim after pleading guilty, she must establish a reasonable probability that, but for her counsel’s ineffectiveness, she would not have pled guilty and would have insisted on going to trial. Hill v. Lockhart, 474 U.S. 52, 59, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985). Were Howell contending that she should spend a lengthy time in a mental institution, her prejudice theory might sound more credible and less opportunistic. But that is not her theory. Neither she nor her experts claim an involuntary commitment in 1997 would have been permanent or lasted much more than six months. At some point, in other words, Howell would have faced responsibility for her admitted role in the three murders. It is Howell’s burden to explain what the consequences of being temporarily committable in 1997 mean today. Had she been evaluated before the transfer hearing by someone else, she appears to suggest, the State would have involuntarily committed her, her co-defendants would have been convicted, and she, upon her release from a mental institution, would no longer have pled guilty. Perhaps; perhaps not. The problem is that she knowingly and voluntarily pled guilty to the murders, and even today she does not deny the truth of her role in the deaths of the three Lillelid family members.
That takes us back to where we started. “Strickland’s test for prejudice is a demanding one,” Storey, 657 F.3d at 379, and requires a petitioner to prove that the “likelihood of a different result” is “substantial, not just conceivable,” Richter, 131 S.Ct. at 792. The state court determined that there was not a substantial likelihood that Howell would have obtained a different result with better counsel. Because this was not an unreasonable application of federal law, we must afford the state court’s decision the “deference and latitude” demanded under AEDPA. Id. at 785.
III.
For these reasons, we affirm.