NOT RECOMMENDED FOR PUBLICATION
File Name: 18a0093n.06

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Feb 27, 2018
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| JASON CLINARD, | ) | |
| Petitioner-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF TENNESSEE |
| RANDY LEE, Warden, | ) | |
| Respondent-Appellee, | ) | |

---

**BEFORE: GUY, CLAY, and WHITE, Circuit Judges.**

**HELENE N. WHITE, Circuit Judge.** Petitioner-Appellant Jason Clinard was fourteen years old when he shot and killed Joyce Gregory, his school bus driver. The state of Tennessee sought to prosecute Clinard as an adult. During his transfer hearing, acting on the advice of his retained counsel, Clinard unexpectedly withdrew his objection to the transfer. He was subsequently charged as an adult, convicted of first-degree premeditated murder, and sentenced to life with the possibility of parole.[1] Clinard's conviction and sentence were upheld on direct appeal, and his numerous arguments for state postconviction relief were rejected. Clinard brought a federal habeas petition, also raising numerous claims, which were all denied. The district court did, however, grant a certificate of appealability as to Clinard's claim that he received ineffective assistance of counsel during his transfer hearing. Because the state court's

---

[1] Under Tennessee law, this effectively means Clinard must serve at least 51 years in prison. *See Vaughn v. State*, 202 S.W.3d 106, 118–19 (Tenn. 2006).

determination that Clinard's counsel was not ineffective in waving the transfer hearing was an

unreasonable application of *Strickland v. Washington*, 466 U.S. 668 (1984), we **REVERSE**, and

**REMAND** to the district court for further proceedings consistent with this opinion.

## I.  FACTS

The facts of the case, as stated by the Tennessee Court of Criminal Appeals, are as

follows:

> On March 2, 2005, the 14-year-old defendant shot and killed his school bus driver, Joyce Gregory, as she sat aboard the bus in front of his house. On the day before the shooting, the victim had reported to the vice-principal of Stewart County High School, where the defendant was a freshman, that the defendant had been dipping snuff on the bus. As a result of the victim's report, the defendant received in-school suspension. The evidence established that the March 1, 2005 incident was not the first time the defendant had violated the school bus rules. He had previously been suspended from riding the bus for fighting and had only returned to riding the bus on February 25, 2005. According to the defendant's 16–year–old nephews, Joseph and Bobby Lee Fulks, the defendant believed that the victim was picking on him and he didn't like [the victim] too much.

> On the morning of the shooting, the defendant rose as usual, readied himself for school, and ate breakfast. As the three boys walked to the bus, the defendant insisted that the Fulks brothers board the bus ahead of him. As the brothers walked to the back of the bus, the defendant aimed a .45 caliber semi-automatic handgun and fired six jacketed hollow point bullets at the victim. Three shots struck the victim in the torso . . . .

> After being shot, the victim attempted to radio for help but succumbed to her injuries before she was able to do so. Meanwhile, the defendant ran around the back of his house and into the woods as Joseph Fulks went inside to telephone 9-1-1. After the victim's foot slipped from the brake, Bobby Fulks steered the bus toward a telephone pole to keep it from going over a steep hill. Bobby Fulks and other high school students helped the remainder of the children out of the emergency exit and into a nearby residence.

> By the time the first police officer arrived on the scene, the victim had died. After the officer confirmed that the victim was dead, he saw the defendant's father, Charlie Clinard, walking toward the bus. Mr. Clinard told the officer that the defendant had shot the victim and retreated to the woods behind the family residence. Officers later reached the defendant on his cellular telephone, and he agreed to surrender. Shortly thereafter, the defendant emerged from the woods

carrying the .45 caliber handgun in one hand and the magazine in the other. He laid both on the ground and surrendered to the authorities.

*Clinard v. State*, No. M2011-01927-CCA-R3PC, 2012 WL 6570893, at \*1–2 (Tenn. Crim. App. Dec. 17, 2012) ["*Clinard III*"] (internal quotation marks removed and citation omitted) (alteration in original).

## II. TENNESSEE JUVENILE TRANSFER LAW

Respondent-Appellee Warden Randy Lee does not dispute that Clinard's counsel's performance was deficient, but argues that the state court reasonably concluded that Clinard was not prejudiced by his counsel's agreement to transfer the case from juvenile court.

In its opinion affirming the denial of postconviction relief, the Tennessee Court of Criminal Appeals explained the relevant law as it existed at the time of Clinard's transfer hearing:

> Juvenile courts have original jurisdiction over children who are alleged to be delinquent. Tenn. Code Ann. § 37-1-134; s*ee also Howell v. State*, 185 S.W.3d 319, 326 (Tenn. 2006). Tennessee Code Annotated section 37-1-134(a) provides the circumstances under which a juvenile court shall transfer a juvenile accused of conduct that constitutes a criminal offense to adult court. For a child less than sixteen years old and charged with a certain offense, such as first degree murder, the child must be provided with notice and a hearing. Tenn. Code Ann. § 37-1-134(a)(1)–(3). The child is to be treated as an adult if the juvenile court finds that there are reasonable grounds to believe that (1) the "child committed the delinquent act as alleged"; (2) the "child is not committable to an institution [] for the developmentally disabled or mentally ill"; and (3) the "interests of the community require that the child be put under legal restraint or discipline." Tenn. Code Ann. § 37-1-134(a)(4)(A)–(C). Moreover, Tennessee Code Annotated section 37-1-134(b) lists the following factors that the judge must consider in deciding whether to treat a juvenile as an adult.
>
> > (1) The extent and nature of the child's prior delinquency records;
> >
> > (2) The nature of past treatment efforts and the nature of the child's response thereto;
> >
> > (3) Whether the offense was against person or property, with greater weight in favor of transfer given to offenses against the person;

(4) Whether the offense was committed in an aggressive and premeditated manner;

(5) The possible rehabilitation of the child by use of procedures, services and facilities currently available to the court in this state; and

(6) whether the child's offense would be considered a criminal gang offense . . . if committed by an adult.

*Clinard III*, 2012 WL 6570893, at *6. Transfer is mandatory if the three elements set out in § 37–1–134(a)(4) are satisfied. *Howell v. Hodge*, 710 F.3d 381, 384 (6th Cir. 2013). Additionally, an individual ceases to be a "child" for any purpose when he or she turns nineteen. Tenn. Code Ann. § 37-1-102(b)(5)(B). Thus, regardless of the seriousness of a child's offense, any term of commitment ends when the child turns nineteen. *Id.* at § 37-1-102(b)(5)(B)(ii); *see Howell*, 710 F.3d at 392 (Stranch, J., concurring).

## III.   PROCEDURAL HISTORY

### A.   Proceedings in the Juvenile Court

Clinard was charged with first-degree murder in the Juvenile Court of Stewart County, Judge Andrew Brigham presiding, and was placed in the Middle Tennessee Mental Health Institute ("MTMHI"). Public Defender Jake Lockert, an attorney with substantial experience as both a prosecutor and a criminal defense attorney, including with murder trials and juvenile cases, was appointed to represent Clinard. Anticipating the state would seek to prosecute Clinard as an adult, Lockert and his staff began to prepare for a transfer hearing. The juvenile court appointed attorney Roselle Shackelford to act as guardian ad litem for Clinard.

Lockert retained Dr. William Bernet,[2] the Director of Forensic Psychiatry at Vanderbilt University, to conduct a forensic psychiatric evaluation of Clinard. Lockert also contacted two of the doctors—Drs. Craddock and Farooque—who were treating Clinard at MTMHI, as well as

---

[2] Dr. Bernet's name also appears in the record as "Burnett."

administrators from that facility, all of whom Lockert came to believe would testify that Clinard could be successfully treated as a juvenile. Lockert also identified witnesses who would testify that Clinard had "no prior criminal behavior," "was a model student involved in extracurricular activities," and "had shown signs of extreme honesty." (Postconviction Hr'g Tr., R. 33-3, PID 396.) Lockert and his staff spent approximately 300 hours working on Clinard's case. Lockert's case file totaled "somewhere between six hundred and a thousand pages." (*Id.* at 400.)

Lockert did not, however, represent Clinard at the transfer hearing. In May 2005, Clinard's family retained attorney Worth Lovett to represent Clinard. Lovett had substantially less experience than Lockert, and, apparently, this was Lovett's first murder case. His practice to that point had consisted primarily of guardian ad litem and juvenile work. Lockert spoke to Lovett on the phone and advised Lovett regarding the witnesses he had secured to testify at the transfer hearing. Lockert emphasized the importance of having the neutral MTMHI doctors testify that Clinard could complete a treatment program by age nineteen. However, Lovett never met with Lockert in person, and never requested Lockert's case file or any further assistance.

Clinard's transfer hearing was held on August 2, 2005. As relevant here, the parties stipulated to the admission of the court-ordered MTMHI evaluation of Clinard, prepared by licensed psychologist M. Duncan Currey, Ph.D. Dr. Currey diagnosed Clinard as suffering from "Major Depressive Disorder, Recurrent, Severe, With Psychotic Features," i.e., auditory and visual hallucinations. (R. 41-17, PID 2428–29, 2433.) Dr. Currey opined that:

> Jason's depression most likely compromised his judgment and reasoning skills, and put him at increased risk for inappropriate behavior, such as acting on his angry impulses. His reports of suicidal thoughts and plans reflect the thinking of a boy who may have developed self-defeating cognitive patterns in a dysfunctional attempt to cope with his negative emotions. Suicidal thoughts in children sometimes reflect feelings of guilt and shame that can manifest in self-destructive behaviors, or in aggression toward others.

> Jason responded well to a structured, supportive environment during the evaluation, and his potential for learning to manage his behavior appropriately will probably increase with ongoing supervision and guidance. Adolescents with similar histories typically respond best to therapeutic, supportive, structured, organized living environments where the goals, consequences, and rewards are clear.

(*Id.* at 2434.) Dr. Currey recommended that Clinard "be placed in an adolescent residential treatment center and receive individual and group therapy, family counseling, anger management training, and psychiatric monitoring of his medication." (*Id.* at 2425.)

Although the state had brought the transfer motion, the juvenile court permitted Dr. Bernet to testify first, as a witness for Clinard, due to a scheduling issue. *Clinard III*, 2012 WL 6570893 at *3. As relevant here, Dr. Bernet testified that, based on reviewing relevant records and evaluating Clinard first-hand, Clinard suffered from "major depressive disorder," "intermittent depressive disorder," and "intermittent explosive disorder." (Transfer Hr'g Tr., R. 41-21, PID 3095.) Dr. Bernet opined that Clinard could be successfully treated in a structured residential setting, using a combination of "individual and group therapy and medication." (*Id.* at 104–05.) Dr. Bernet explained that when individuals suffering from major depressive disorder "are treated with both medication and appropriate psychotherapy . . . around 80 percent, maybe 85 percent recover." (R. 41-21, PID 3097.) Dr. Bernet also testified that "[m]ost people" with intermittent explosive disorder "can learn how to manage their anger and deal with it through either therapy or medication." (*Id.* at 3096–97.) Dr. Bernet further opined, based on his experience as a former consultant to the juvenile-justice system, that Clinard could be appropriately treated within that system, and that treatment up to the age of nineteen "should be long enough certainly to address his psychiatric issue." (*Id.* at 3097, 3102–03.) Dr. Bernet acknowledged, however, that there could be no guaranty that treatment would be successful or that Clinard would not reoffend. In particular, Dr. Bernet opined that, due to a genetic variation

that affects how his brain processes serotonin, Clinard was predisposed to depression, and that predisposition would stay with him throughout his life.

After Dr. Bernet's testimony, the state called psychiatrist Kimberly Stalford. Dr. Stalford reviewed Clinard's MTMHI records, but did not interview Clinard. Based on her review of the records, Dr. Stalford concluded that Clinard did not suffer from a major depressive disorder. She also opined that Clinard was not experiencing hallucinations or suffering from "true psychosis," but instead was engaged in "delusional thinking." (Transfer Hr'g Tr., R. 41-21, PID 3114.) Thus, Dr. Stalford concluded that, if Clinard was depressed, it was "significantly less than what Dr. Bernet" had diagnosed. (*Id.* at 3118; 3126–27.) When asked about treatment, Dr. Stalford acknowledged that depression is "a treatable medical problem," but that Clinard's genetic predisposition to depression "c[ould] not be treated." (*Id.* at 3118, 3122.) Asked separately about rehabilitation, Dr. Stalford opined that "the best predictor for violence is a previous history of violence, and the severity of the violence is an important issue." (*Id.* at 3123.) She did not, however, actually offer an opinion as to the likelihood that Clinard would reoffend.

The state then presented testimony from Tom Texture, the first police officer to respond to the shooting. Texture described his arrival on the scene, his discovery that Gregory had been killed, and Clinard's arrest by other officers. Jason Gillespie, another officer, provided similar testimony, and also identified the handgun recovered from Clinard. Finally, Clinard's 16-year-old twin nephews, Joseph and Bobby Fulks, testified about the shooting.

At that point, the court recessed. According to Judge Brigham, "[t]here was an in-chambers discussion and . . . Mr. Lovett with the presence of the [guardian ad litem] had recommended to Mr. Clinard that the transfer hearing stop and that he agree[] to the transfer." (Postconviction Hr'g, R. 33-3, PID 438–39.) This surprised Judge Brigham, because the state

had not rested, and "[t]he defense hadn't started yet other than that out-of-order witness [Dr. Bernet]." (*Id.* at 439.) The only explanation Judge Brigham could recall for the decision was that "the defense was concerned that the record was developing against their client," and that the record of the transfer hearing might be used against Clinard at trial or by the corrections department. (*Id*. at 439, 459.)

The parties prepared an Agreed Order stating that the elements of the transfer statute were satisfied, and the judge signed the order, transferring Clinard to the jurisdiction of the Circuit Court of Stewart County. Clinard was fifteen years old at the time of the transfer.

**B.      Subsequent State Court Proceedings**

After his transfer, Clinard was tried and convicted of first-degree premediated murder. *State v. Clinard*, No. M2007-00406-CCA-R3CD, 2008 WL 4170272, at *1 (Tenn. Crim. App. Sept. 9, 2008) ["*Clinard I*"]. Because the state did not seek a sentence of life imprisonment without the possibility of parole, Clinard "received the statutorily mandated sentence of life imprisonment." *Id.* at *2. The Court of Criminal Appeals of Tennessee upheld his conviction and sentence on direct appeal, rejecting arguments not raised here. *Id.* at *2–7. Clinard did not seek further review of that decision.

Clinard petitioned for postconviction relief in the state trial court on January 29, 2009. *Clinard v. State*, No. M2012-00839-CCA-R3HC, 2012 WL 4459717, at *2 (Tenn. Crim. App. Sept. 27, 2012) ["*Clinard II*"]. Among other contentions, Clinard raised the claim now before this court—that he received ineffective assistance of counsel at the transfer hearing. *Clinard III*, 2012 WL 6570893 at *2.

The state postconviction trial court held an evidentiary hearing on August 3, 2011. Lockert testified about the work he and his staff performed on Clinard's behalf, particularly his

efforts to identify mental-health professionals and administrators from MTMHI who would testify that Clinard could successfully be treated as a juvenile, as well as Lovett's failure to retrieve Lockert's voluminous case file. (*See* discussion *supra* Section III.A.)

Judge Brigham also testified. Addressing Clinard's decision to accede to the transfer, Judge Brigham stated: "Quite frankly the decision was surprising and I was caught off guard." *Clinard III*, 2012 WL 6570893, at *3 (quotation marks omitted). Judge Brigham "was surprised because defense counsel had not presented any witnesses other than Dr. Bernet." *Id.* The state postconviction appellate court summarized the remainder of Judge Brigham's relevant testimony:

> He stated that at the time of defense counsel's recommendation, he had not yet made a decision as to how he would rule on the transfer. In particular, he was going to consider possible rehabilitation programs available to the Petitioner in juvenile court, the Petitioner's amenability to rehabilitation, and evidence showing the existence of premeditation. He stated, "There was a lot still I was going to weigh."
>
> On cross-examination, Judge Brigham testified that probable cause as to whether the Petitioner had committed the act was "still somewhat in the air" when the Petitioner waived the remainder of the transfer hearing. Dr. Bernet was in favor of the Petitioner's case remaining in juvenile court. However, experts from MTMHI had concluded that the Petitioner was not committable. Judge Brigham had been expecting the defense to present testimony about programs that could rehabilitate the Petitioner and whether he could be rehabilitated by the time he turned nineteen years old. Judge Brigham said he was concerned about the Petitioner's being released from custody at nineteen because "we were dealing with a relatively short period of time." He acknowledged that the defense would have had to present overwhelming proof that the Petitioner could be rehabilitated before he would have decided not to transfer the case to circuit court. He acknowledged signing a transfer order, stating that all of the requirements of the juvenile transfer statute had been satisfied. He said that he probably would not have signed the order if he had not believed enough evidence existed to transfer the Petitioner's case to adult court.
>
> On redirect examination, Judge Brigham testified that although he signed the transfer order, he did not have to make a decision to transfer the Petitioner's case to adult court because the Petitioner agreed to the transfer.

*Id.* at \*3-4. Aptly summarizing, the state court concluded that for Judge Brigham, "the issue of transfer was very much in doubt when counsel agreed to waive the hearing." *Id.* at \*9.

Finally, Agent Joe Craig of the Tennessee Bureau of Investigation, the lead investigator in Clinard's case, testified that he was present at the transfer hearing and, if the hearing had continued, he would have provided additional details about the crime, the investigation, and the evidence collected at the scene and thereafter.

Applying *Strickland v. Washington*, 466 U.S. 668 (1984), and relevant state precedents, "the post-conviction court found that trial counsel's performance was deficient because counsel should have 'at least [attempted] to prevent the transfer using mental health testimony' and because counsel agreed to the transfer without receiving a 'significant concession' from the State." *Clinard III*, 2012 WL 6570893 at \*4 (alteration in original) (quoting R. 41-15, PID 2291). However, the postconviction trial court found that Clinard was not prejudiced by Lovett's deficient performance. In reaching that conclusion, the court recognized that the only truly disputed issue was whether the "interests of the community require[d] that [Clinard] be put under legal restraint or discipline"—a necessary predicate for transfer. Tenn. Code Ann. § 37-1-134(a)(4)(C). As to the rehabilitation question, the court stated that:

> the proof on this issue is in equipoise. The defense expert was of the opinion that Petitioner could be successfully treated within the four years available to the juvenile court system and the State's expert was doubtful that Petitioner could be successfully treated at all. The MTMHI evaluation found that Petitioner was not committable to a mental health institution on an involuntary basis.
>
> This Court considers this factor as being in equipoise, favoring neither retention in juvenile court nor transfer to adult court.

(R. 41-15, PID 2299.) The court then concluded: "[c]onsidering all of the [§ 37-1-134-(b)] factors and the facts of the case, this Court is of the opinion that there is no reasonable probability that Petitioner would not have been transferred to adult court had all of the evidence

been presented to the juvenile court." (*Id.* at 2300.) The trial court did not, however, discuss Judge Brigham's testimony or acknowledge that Judge Brigham was focused on the rehabilitation question and that he remained undecided when the hearing was cut short.

The state appellate court agreed with the trial court as to both deficient performance and lack of prejudice, and affirmed the denial of postconviction relief. *Clinard III*, 2012 WL 6570893 at *8–9. The appellate court acknowledged Judge Brigham's testimony, and specifically found that in Judge Brigham's mind, "the issue of transfer was very much in doubt when counsel agreed to waive the hearing." *Id.* at *9. Nevertheless, the appellate court accepted the trial court's conclusion:

> The Petitioner argues that the testimony of Jake Lockert, who testified about the proof he developed for the transfer hearing, and Judge Brigham, who testified that the issue of transfer was very much in doubt when counsel agreed to waive the hearing, established that he was prejudiced by counsel's deficient performance. However, the post-conviction court considered all of the evidence presented at the transfer hearing, considered all of the evidence presented at the evidentiary hearing, and addressed all of the factors set out in the juvenile transfer statute. The Petitioner did not present any additional evidence at the evidentiary hearing to address those factors. Therefore, we conclude that the Petitioner has failed to establish that but for counsel's deficient performance, his case would not have been transferred from juvenile court to adult court.

*Id.* at *9. The Tennessee Supreme Court denied Clinard's application for permission to appeal.

## C. Proceedings in the District Court

Clinard filed a pro se petition for habeas corpus relief in the district court. Counsel was appointed, and the operative amended petition was filed on May 2, 2016, asserting that Lovett was ineffective at the transfer hearing by (1) agreeing to the transfer, and (2) failing to call Drs. Craddock and Farooque of MTMHI.[3] The district court agreed with the state courts that Lovett's

---

[3] Clinard has abandoned his other claims by not seeking to expand the certificate of appealability.

performance at the transfer hearing was deficient, but that Clinard had not established prejudice. The district court granted a certificate of appealability and this timely appeal followed.

## IV. <u>DISCUSSION</u>

### A. Standard of Review and Applicable Law

We review de novo the district court's legal conclusions and its answers to mixed questions of fact and law. *Lucas v. O'Dea*, 179 F.3d 412, 416 (6th Cir. 1999) (citation omitted). The district court's independent findings of fact are reviewed for clear error, *id.*, but findings based only on the district court's reading of the state court record are reviewed de novo, *Slagle v. Bagley*, 457 F.3d 501, 513 (6th Cir. 2006).

Clinard filed this habeas petition after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (AEDPA), so AEDPA standards govern this appeal. *See Lindh v. Murphy*, 521 U.S. 320, 326–27 (1997). Under AEDPA,

> a federal court may not grant a writ of habeas corpus with respect to any claim adjudicated on the merits in state court unless the state adjudication: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

*Cauthern v. Colson*, 736 F.3d 465, 473 (6th Cir. 2013) (quoting 28 U.S.C. § 2254(d)). The petitioner carries the burden of proving that this standard has been met. *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

> In analyzing whether a state court decision is contrary to or an unreasonable application of clearly established Supreme Court precedent, a federal court may look only to the holdings of the Supreme Court's decisions, not the dicta. A state court decision on the merits is contrary to clearly established Supreme Court precedent only if the reasoning or the result of the decision contradicts that precedent.

*LaMar v. Houk*, 798 F.3d 405, 415 (6th Cir. 2015) (citations omitted). Further,

> [t]o violate the unreasonable-application clause, after identifying the correct governing legal principle from the Supreme Court's decisions, the state court decision must (a) unreasonably apply it to the facts, or (b) either unreasonably extend or unreasonably refuse to extend a legal principle from Supreme Court precedent to a new context. The state-court application of Supreme Court precedent must have been "objectively unreasonable," not simply erroneous or incorrect.

*Id.* (citations omitted). "State-court factual findings are presumed correct unless the applicant rebuts them by clear and convincing evidence." *Id.* (citing 28 U.S.C. § 2254(e)(1)). Finally, we review "the last reasoned state court decision." *Cauthern*, 736 F.3d at 473 (citing *Pinholster*, 563 U.S. at 187–88). Here, that is the Court of Criminal Appeals of Tennessee's opinion affirming the denial of Clinard's petition for postconviction relief. *See Clinard III*, 2012 WL 6570893.

Juveniles are entitled to the effective assistance of counsel at transfer hearings. *Kent v. United States*, 383 U.S. 541, 554 (1966). To establish the deprivation of that right, Clinard must show that 1) counsel's performance was deficient—objectively unreasonable under prevailing professional norms—and 2) it prejudiced the defense. *Strickland*, 466 U.S. at 687. Here, the state courts found that Lovett's performance was deficient, *Clinard III*, 2012 WL 6570893 at *8, and the Warden does not challenge that determination.

Prejudice is established by showing there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. *Strickland*, 466 U.S. at 694. Although the reasonable-probability standard is lower than the more-probable-than-not standard, *Kyles v. Whitley*, 514 U.S. 419, 434 (1995); *Strickland*, 466 U.S. at 693–94, the difference between the two "is slight and matters 'only in the rarest

case.'   The likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112 (2011) (quoting *Strickland*, 466 U.S. at 697).[4]

**B.     Analysis**

The question before us "is whether there is any reasonable argument that [Clinard's] counsel satisfied *Strickland*'s deferential standard" when he waived the transfer hearing. *Richter*, 562 U.S. at 105.  The answer is "no."

1.      The State Postconviction Appellate Court Applied the Correct Legal Standard

As a preliminary matter, Clinard asserts that we should review his claim de novo because the state postconviction appellate court "applied the wrong standard" when assessing prejudice. (Appellant's Br. at 45).  In support of that argument, Clinard focuses on the final sentence of the court's analysis:  "Therefore, we conclude that the Petitioner has failed to establish that but for counsel's deficient performance, his case would not have been transferred from juvenile court to adult court."   *Clinard III*, 2012 WL 6570893 at *9.   Clinard contends that this language[5] indicates the state appellate court improperly applied a preponderance-of-the-evidence standard to the prejudice question.  However, the court correctly stated the applicable standard earlier in its opinion:  "To establish prejudice, the petitioner must show that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.'"   *Clinard III*, 2012 WL 6570893 at *5 (quoting *Strickland*, 466 U.S. at 694).  The court also noted that "[c]onsidering all the factors, the post-conviction [trial] court concluded that

---

[4] We reject Clinard's assertion that "reasonable probability" equals 20% because that view is incompatible with *Richter*, and the Supreme Court has rejected "mechanical rules" for ineffective assistance cases. *Strickland*, 466 U.S. at 69.

[5] Clinard also identifies an earlier incorrect recitation of the *Strickland* standard in the state appellate court's opinion.

'there is no reasonable probability that Petitioner would not have been transferred to adult court had all of the evidence been presented to the juvenile court.'" *Id.* at \*8 (quoting R. 33-4, PID 512). Habeas review includes a "presumption that state courts know and follow the law." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam) (citations omitted). Omitting the words "reasonable probability" when reciting the *Strickland* standard does not justify de novo review when the state court correctly stated and applied the standard in the "central" portion of its opinion. *Id.* at 23. That is the case here.

*Vasquez v. Bradshaw*, 345 F. App'x 104 (6th Cir. 2009), on which Clinard relies, is both unpublished and distinguishable. In *Vasquez*, the state postconviction trial court "relied directly" on an incorrect formulation of the *Strickland* standard for prejudice. 345 F. App'x at 110–11. The state appellate court stated the correct standard once, but then "expressly adopted the erroneous legal reasoning of the court below." *Id.* at 112. Distinguishing *Woodford* on that basis, our court found an unreasonable application of federal law and proceeded to review the petitioner's claim de novo. *Id.* This case is different. The state postconviction trial court applied the correct standard, (R. 33-4, PID 512), and the appellate court "expressly adopted" the "legal reasoning of the court below," *Vasquez*, 345 F. App'x at 112, despite an incomplete recitation of the *Strickland* prejudice standard, *see Clinard III*, 2012 WL 6570893 at \*5, \*8–9. The state postconviction appellate court did not apply the wrong standard.[6]

---

[6] Whether de novo review should apply because, as Clinard contends, the state postconviction courts unreasonably failed to discuss Dr. Currey's opinion that Clinard could likely be rehabilitated and mischaracterized Dr. Stalford's testimony—and thus their decisions are "based on an unreasonable determination of the facts," *see* 28 U.S.C. § 2254(d)(2)—is a closer question. We need not decide that issue, however, because Clinard is entitled to relief even under the more deferential AEDPA standard of review.

2.    The State Postconviction Courts Unreasonably Applied *Strickland*

Clinard's petition asserts that Lovett provided constitutionally inadequate assistance at the transfer hearing on two theories:  (a) Lovett failed to call Drs. Craddock and Farooque and unnamed state juvenile facility administrators at the transfer hearing; and (b) Lovett agreed to the transfer.  On appeal, Clinard has not briefed the first theory and we therefore deem it abandoned. We conclude he is entitled to relief on the second theory.

As Clinard acknowledges, the evidence presented at the transfer hearing clearly established reasonable grounds to believe that Clinard murdered Gregory and was not committable.  Thus, the juvenile court was required to transfer Clinard if the "interests of the community require[d] that [Clinard] be put under legal restraint or discipline."  *See* Tenn. Code Ann. § 37-1-134(a)(4)(A)–(C); *Howell*, 710 F.3d at 384.  Looking to the six specified factors relevant to that question, Clinard had no past history of delinquency or treatment (factors 1 and 2), his offense was not gang-related (factor 6), and he had committed an aggressive and premediated offense against a person (factors 3 and 4);[7] the only issue in dispute was whether Clinard could be rehabilitated (factor 5).  *See* Tenn. Code Ann. § 37-1-134(b).  For Judge Brigham, the focus of *that* question was whether Clinard could be rehabilitated before age nineteen such that he would not reoffend.  And because Judge Brigham was uncertain about Clinard's potential for rehabilitation, he "hadn't made up [his] mind" whether to approve the transfer.  (Postconviction Hr'g Tr., R. 33-3, PID 463.)

---

[7] Judge Brigham testified that he had not decided whether the murder was premeditated, but the postconviction trial court held that the evidence "established without question" that it was.  (R. 41-15, PID 2298.)  Clinard does not challenge this factual conclusion, nor would such a challenge succeed in light of AEDPA deference.

There was ample evidence at the transfer hearing that could have led Judge Brigham to decide the rehabilitation issue in Clinard's favor. Dr. Currey's report spoke favorably about Clinard's ability to learn to manage his behavior. And based on his experience as a consultant to the juvenile-justice system, Dr. Bernet opined that treatment up to the age of nineteen "should be long enough certainly to address [Clinard's] psychiatric issue." (R. 41-21, PID 3097, 3102–03.) Even Dr. Stalford, the state's expert, acknowledged that Clinard's depression was treatable, even if his genetic susceptibility to stress was not. The only contrary evidence was Dr. Stalford's testimony that "the best predictor for violence is a previous history of violence, and the severity of the violence is an important issue." (*Id.* at 3123.)

Crucially, although Judge Brigham "testified that the issue of transfer was very much in doubt when counsel agreed to waive the hearing," the state postconviction appellate court concluded that there was not a reasonable probability that competent representation would have produced a different result. *Clinard III*, 2012 WL 6570893 at \*9. In doing so, the appellate court accepted the trial court's conclusion that, "[c]onsidering all of the [§ 37-1-134-(b)] factors and the facts of this case . . . there is no reasonable probability that Petitioner would not have been transferred to adult court." (R. 41-15, PID 2291); *see Clinard III*, 2012 WL 6570893 at \*9.

These determinations unreasonably applied *Strickland* to the facts of this case. *See LaMar*, 798 F.3d at 415. Specifically, the state postconviction appellate court ignored its own factual finding that in Judge Brigham's mind, "the issue of transfer was very much in doubt when counsel agreed to waive the hearing." *Clinard III*, 2012 WL 6570893, at \*9. Under *Strickland*, the prejudice determination "proceed[s] on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision." 466 U.S. at 695. And "evidence about the actual process of decision" must be considered when

it is "part of the record of the proceeding under review." *Id.* The record in this case demonstrates the wisdom of that rule. Judge Brigham approached a difficult case with an open mind. In the best judicial tradition, he conscientiously waited to make any decision until after all the evidence was presented. When a "reasonabl[e], conscientious[], and impartial[]" judge says that he had not made up his mind, and the evidence is in "equipoise," as observed by the postconviction trial court and apparently accepted by the appellate court, "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694–95. It is the rare case that benefits from judicial testimony such as that offered by Judge Brigham. In a case that challenges counsel's decision to abandon an issue that would have been subject to a discretionary ruling, such as a transfer to adult court, the decisionmaker's testimony that he had not made a decision at the time the issue was abandoned must be considered.

> Here, the district court described its reasoning as follows:
>
> The Juvenile Court Judge testified that he was not disposed one way or the other when the Petitioner chose to waive any further opposition to transfer. That, coupled with the seriousness of the offense, that the offense was premeditated, that the Petitioner had already exhibited signs of aggressive behavior with other students, and that the medical experts seemed to agree that the Petitioner was not eligible for involuntary commitment to a mental health facility, forecloses any finding that there was a substantial likelihood that the Petitioner would not have been transferred but for counsel's error.

*Clinard v. Lee*, No. 3:13-CV-01190, 2016 WL 5845901, at *4 (M.D. Tenn. Oct. 6, 2016) (record citations omitted). The Warden also urges that the evidence in favor of transfer was overwhelming. True, the evidence that Clinard committed a premeditated murder was unassailable, and the details of the crime are undisputed. But the district court did not account for the evidence that Clinard could be successfully treated before he aged out of the juvenile system, a consideration that was important to Judge Brigham in applying the controlling factor.

Nor does the Warden address on appeal the rehabilitation evidence actually presented at the transfer hearing.  In light of that evidence and his statutory obligation to consider the rehabilitation issue, Judge Brigham remained undecided when the transfer hearing was cut short. Ultimately, given the seriousness of the crime, Judge Brigham might have granted the transfer motion despite the possibility that Clinard would be successfully rehabilitated by age nineteen. *See State v. Strickland*, 532 S.W.2d 912, 920 (Tenn. 1975) (listing "the seriousness of the alleged crime" as one factor to be considered in transfer decisions).  But Judge Brigham's testimony makes clear that denying the motion was also a reasonable probability.

The district court also relied on *Spytma v. Howes*, 313 F.3d 363 (6th Cir. 2002).  (*See* R. 45, PID 4628.)  In *Spytma*, a 15-year-old participated in the beating, sexual assault, and murder of a neighbor.  313 F.3d at 365.  The Michigan juvenile court failed to follow all the procedural requirements of the applicable transfer statute, but this court held that any due process violation was harmless "because no reasonable probate judge would have failed to waive jurisdiction given the brutality of the crime."  *Id.* at 368–70.  However, *Spytma* was not an ineffective-assistance case, and there was no testimony from the probate judge.  Further, as difficult as the facts of this case are, the facts in *Spytma* were even more disturbing.  We therefore find *Spytma* inapposite.

Finally, the Warden argues that we should not dwell on Judge Brigham's testimony and should focus instead on the Agreed Order, drafted by the parties and signed by Judge Brigham after Clinard agreed to be transferred, which states that the requirements of the transfer statute were met.  We note that although the Warden's brief mentions the Agreed Order in passing, it was only at oral argument that the Warden contended that the Agreed Order had any particular significance.  *See Lindsey v. Detroit Entm't, LLC*, 484 F.3d 824, 831 n.9 (6th Cir. 2007) (issues

not raised prior to oral argument are waived).  In any event, it is clear from Judge Brigham's testimony that he entered the Agreed Order because the parties asked him to, and that there is a reasonable probability he would have reached a different conclusion if Lovett's deficient performance had not taken the matter out of his hands.  *See Clinard III*, 2012 WL 6570893 ("Judge Brigham testified that although he signed the transfer order, he did not have to make a decision to transfer the Petitioner's case to adult court because the Petitioner agreed to the transfer.").

In sum, there is no reasonable argument that Clinard was not prejudiced by his counsel's deficient performance.

**C.     Remedy**

Having concluded that the district court erred in denying the petition, we turn to the question of relief.  In his brief, Clinard asserts that we should order his conviction vacated entirely.  At oral argument, however, Clinard conceded that, in light of *Kent* and *White v. Sowders*, 644 F.2d 1177 (6th Cir. 1980), an appropriate remedy would be to remand the case to the district court.  We agree.

In *Kent*, the Supreme Court found that the petitioner's due process rights were violated when a District of Columbia juvenile court waived its jurisdiction—equivalent to a transfer determination under Tennessee law—without conducting the "full investigation" required by the District's Juvenile Court Act.  383 U.S. at 546–47.  The Court went on to discuss its disposition of the case:

> Ordinarily we would reverse . . . and direct the District Court to remand the case to the Juvenile Court for a new determination of waiver.  If on remand the decision were against waiver, the indictment in the District Court would be dismissed.  However, *petitioner has now passed the age of 21 and the Juvenile Court can no longer exercise jurisdiction over him.*  In view of the unavailability of a redetermination of the waiver question by the Juvenile Court, it is urged by

> petitioner that the conviction should be vacated and the indictment dismissed. In the circumstances of this case . . . we do not consider it appropriate to grant this drastic relief. Accordingly, we vacate the order of the Court of Appeals and the judgment of the District Court and *remand the case to the District Court for a hearing de novo on waiver*, consistent with this opinion. If that court finds that waiver was inappropriate, petitioner's conviction must be vacated. If, however, it finds that the waiver order was proper when originally made, the District Court may proceed, after consideration of such motions as counsel may make and such further proceedings, if any, as may be warranted, to enter an appropriate judgment.

*Id.* at 564–65 (emphasis added; citations and footnotes omitted).

In *White*, this court faced a similar situation. The habeas petitioner in that case had committed a robbery when he was seventeen. *White*, 644 F.2d at 1178. A Kentucky juvenile court waived jurisdiction and allowed White to be tried as an adult, without making the findings of fact required by the relevant Kentucky statute. *Id.* at 1179. The state conceded a *Kent* violation, and this court found the petitioner entitled to relief. *Id.* at 1180–84. By that time, however, the "petitioner [wa]s no longer a minor and [wa]s not subject to juvenile court jurisdiction." *Id.* at 1184. The petitioner argued his conviction should be vacated unconditionally, but this court disagreed, and instead "remand[ed] to the district court for a hearing de novo on the question of waiver." *Id.* at 1185.

Here, because there is a reasonable probability that Clinard would not have been transferred to adult court absent his counsel's ineffective assistance, Clinard is entitled to a new transfer hearing. And, as in *White*, because "an opportunity has already been accorded the state courts to resolve the issue . . . , we believe our discretion is better exercised by a remand to the district court for the purpose of holding [a new transfer] hearing in that court." *Id.*

### V. CONCLUSION

For the foregoing reasons, we **REVERSE** the judgment below and **REMAND** the case for further proceedings consistent with this opinion.

-21-